1
2
3
4
5
6
7
8
9
10              **UNITED STATES DISTRICT COURT**
11            **SOUTHERN DISTRICT OF CALIFORNIA**
12
    TIFFANY L. (HAYES) AGUAYO,          Case No. 13-cv-1435-BAS(KSC)
13  (691), *et al.*,
                                        **ORDER:**
14                          Plaintiffs,
                                        **(1) DENYING PLAINTIFFS'**
15       v.                             **MOTION FOR SUMMARY**
                                        **JUDGMENT; AND**
16
                                        **(2) GRANTING DEFENDANTS'**
17  SALLY JEWELL, Secretary of the      **CROSS-MOTION FOR SUMMARY**
    Department of Interior - United States  **JUDGMENT**
18  of America, *et al.*,
                                        **[ECF Nos. 54, 57]**
19                          Defendants.
20

21          On June 19, 2013, Plaintiffs commenced this declaratory-relief action seeking

22  judicial review of a decision issued by the Assistant Secretary – Indian Affairs

23  ("Assistant Secretary" or "AS-IS") under the Administrative Procedure Act ("APA"),

24  5 U.S.C. § 706(2)(A), against Defendants Sally Jewell, Secretary of the Department of

25  Interior; Kevin Washburn, Assistant Secretary of the Department of Interior – Indian

26  Affairs; Amy Dutschke, Regional Director Department of Interior Indian Affairs,

27  Pacific Regional Office; and Robert Eben, Superintendent of Interior Indian Affairs,

28  Southern California Agency.  Each defendant is sued in their official capacities.  This

action arises from the disenrollment of the named plaintiffs from the Pala Band of Mission Indians ("Pala Band" or "Band").[1]  Now pending before the Court are the parties' cross-motions for summary judgment.

Having reviewed the papers submitted and oral argument from both parties, the Court **DENIES** Plaintiffs' motion for summary judgment, and **GRANTS** Defendants' cross-motion for summary judgment.

## I.    BACKGROUND[2]

"For nearly two centuries now, [federal law has] recognized Indian tribes as 'distinct, independent political communities,' qualified to exercise many of the powers and prerogatives of self-government." *Plains Commerce Bank v. Long Family & Cattle Co.*, 554 U.S. 316, 327 (2008) (citations omitted) (quoting *Worcester v. Georgia*, 6 Pet. 515, 559 (1832)) (citing *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978)).  The "sovereignty that the Indian tribes retain is of a unique and limited character." *Wheeler*, 435 U.S. at 323.  "[T]ribes are subject to plenary control by Congress," but they also remain "separate sovereigns pre-existing the Constitution." *Santa Clara*

---

[1] The following are the named plaintiffs in this action (collectively referred to as "Plaintiffs"): Tiffany L. (Hayes) Aguayo (691); Karen (Renio) Duro (766); Rosa Estrada (752); Christian Griffith (789); Justin Griffith (790); Natasha Griffith (791); Cameron C. Hayes (690); Pamela Kennedy (960); Elizabeth Martinez (863); Jacqueline McWhorter (861); Dawn Mojado (759); Priscilla Mojado (796); Michael Peralta (762); Johnny Poling (783); Jessica Renteria (751); Adam Trujillo (879); Andrea Trujillo (768); Annalee H. (Yanez) Trujillo (735); Bradley L. Trujillo, Jr. (1038); Brandon M. Trujillo, Sr. (812); Brian A. Trujillo, II (769); Charles Trujillo (1039); Donald Trujillo (737); Jennifer Trujillo (770); John A. Trujillo (738); Jonathan Trujillo (771); Joshua E. Trujillo (829); Kristine Trujillo (813); Laura J. Trujillo (772); Leslie Trujillo (880); Marlene Trujillo (739); Randolph W. Trujillo (740); Shalah M. Trujillo (741); Tina Trujillo-Poulin (775); Annette E. Walsh (745); Brenda J. Walsh (746); Eric J. Walsh (814); Patricia A. Walsh (747); Stephanie S. Walsh (815); Juanita Luna (507) as guardian ad litem for minors Lanise Luna (1090), Shalea Luna (1032), and Anthony Luna Trujillo (946); Brian Trujillo, Sr. (475) as guardian ad litem for minors Jacob Trujillo (995), Miriam Trujillo, Rachel Ellis-Trujillo (983), Rebekah Trujillo (937), and Richard Trujillo; Michelle Trujillo (470) as guardian ad litem for minors Brianna Mendoza (989), Angel Morales (902), Destiny Pena (1097), Mari Pena (991), Mauro Pena (992), Rogelio Pena (1098), Geronimo Poling (1100), Krista Poling (1060), Kristopher Poling (1061), and Cheyenne Trujillo (936); Peter Trujillo, Jr. (471) as guardian ad litem for minors Brandon Trujillo, Jr. (1212), Feather Trujillo (913), Kawish Trujillo (1213), Mukikmal Trujillo (1174), and Tashpa Trujillo (1113); and Susanne Walsh (483) as guardian ad litem for minors Joseph Ravago (1015) and Kaley Ravago (1061).

[2] References to the Administrative Record will be designated with the prefix "AR" followed by the appropriate Bates-stamped page number.

*Pueblo v. Martinez*, 436 U.S. 49, 56 (1978); *see United States v. Lara*, 541 U.S. 193, 200 (2004). "Thus, unless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, — U.S. —, 134 S. Ct. 2024, 2030 (2014) (citing *Wheeler*, 435 U.S. at 323).

"As part of their residual sovereignty, tribes retain power to legislate and to tax activities on the reservation, including certain activities by nonmembers, to determine tribal membership, and to regulate domestic relations among members." *Plains Commerce Bank*, 554 U.S. at 327 (citations omitted). "An Indian tribe has the power to define membership as it chooses, subject to the plenary power of Congress." *Williams v. Gover*, 490 F.3d 785, 789 (9th Cir. 2007). "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Santa Clara Pueblo*, 436 U.S. at 72 n.32.

**A.    The Pala Band's Governing Documents and Enrollment Ordinances**

In the Indian Reorganization Act, Congress recognized each Indian tribe's "inherent sovereign power to adopt governing documents under procedures other than those specified in [the Act]." 25 U.S.C. § 476(h)(1). In accordance with the Indian Reorganization Act, the Pala Band adopted its first governing document—the Articles of Association—in 1960. (AR 4, 2096.) It was adopted by a vote of 21 in favor and none opposed in a "duly called general tribal meeting." (AR 2103.) In March 1960, the Commissioner of Indian Affairs subsequently approved the Articles of Association. (AR 4, 2116.)

With the desire to prepare an official membership roll in accordance with Section 2 of the Articles of Association, the Pala Band adopted its first enrollment ordinance—Ordinance No. 1—to establish "regulations governing procedures for enrollment and for keeping the roll on a current basis," which came into effect in November 1961. (AR 2116, 2119.) The Pala Band's Executive Committee ("EC") was delegated the responsibility of reviewing and approving or disapproving each

application for enrollment.[3]  (AR 2117.)  Once the EC approved or disapproved an application, it was then required to file the application with the Area Director (now known as the Regional Director) of the Bureau of Indian Affairs ("BIA").  (*Id.*) Following the receipt of the application from the EC, the Area Director was required to "review the enrollment applications and the reports and recommendations of the Executive Committee and . . . determine the applicants who are eligible for enrollment[.]"  (*Id.*)  Next, the Area Director was required to notify the EC of any action taken on the applications, and "if approved, the notice will constitute authority for the [Executive] Committee to enter the applicant's name on the membership roll." (*Id.*)  The ordinance also contains a provision for rejected applicants to appeal to the Commissioner of Indian Affairs and then to the Secretary of the Interior.  (AR 2118.) The Secretary's decision on an appeal is deemed "final and conclusive" under the original enrollment ordinance.  (*Id.*)

On November 22, 1994, the Pala Band "voted to accept the new Constitution" at the tribal elections, which was approved by a vote of 131 in favor and 65 opposed, beginning the process of adopting a Constitution "to supersede the Articles of Association." (AR 4, 2121; *see* AR 2137.) Subsequently, a certification of the election results was sent to the BIA. (AR 2121.) In a document titled "Resolution 97-36: Tribal Constitution," the Pala Band General Council certified that they, "exercising [their] inherent rights as a sovereign, federally-recognized Tribe . . . adopt[ed] the Pala Tribal Constitution to supersede the Articles of Association" at a duly-called meeting held on November 19, 1997 with a quorum present by a vote of 27 in favor and none opposed. (AR 2137.)  The resolution and the Constitution of the Pala Band (Revised) ("1997 Constitution") was sent to the Acting Regional Director, who approved the Constitution in July 2000.  (AR 2139-41.)  In accordance with Article IX Section 9 of

---

[3] The Pala Band is governed by the EC, which is composed of six members elected by the Pala Band General Council, with certain enumerated "administrative powers and duties[.]"  (AR 2098, 2317.)  The General Council "includes all qualified voters 18 years and older."  (AR 2092, 2098, 2314.)  These definitions have largely remained intact since 1960.

13cv1435

1  the 1997 Constitution, the Constitution became "effective immediately after its
2  approval by a majority vote of the voters voting in a duly-called election[] at which this
3  Constitution is approved by the Bureau of Indian Affairs." (AR 2322.)

4      The 1997 Constitution delegated the authority to "from time to time amend
5  and/or replace its existing Enrollment Ordinance with an Ordinance governing
6  adoption, loss of membership, disenrollment, and future membership" to the Pala Band
7  EC. (AR 2314.) Pursuant to that authority, the EC adopted a revised version of
8  Ordinance No. 1 on July 22, 2009. (AR 2324-33.) The revised Ordinance No. 1
9  includes the prefatory statement that:

10
11  the Executive Committee of the Pala Band, by adoption of
   this revised Ordinance, does not intend to alter or change the
   membership status of individuals whose membership has
12  already been approved and who are currently listed on the
   membership roll of the Pala Band of Mission Indians, nor
13  does it intend to change the membership status of those
   persons whose membership applications have previously
14  been disapproved[.]

15  (AR 2325.) Despite the Pala Band's stated intention, Section 6 of the revised
16  Ordinance No. 1 nonetheless confers the authority to reevaluate membership
17  applications "[s]hould the Executive Committee subsequently find that an applicant or
18  the person filing the application on his/her behalf misrepresented or omitted facts that
19  might have made him/her ineligible for enrollment[.]" (AR 2329-30.) Upon
20  reevaluation, the ordinance allows the EC to remove the member's name from the Pala
21  Band's roll subject to an appeal of the decision. (AR 2330.) A rejected applicant may
22  appeal to the BIA's Pacific Regional Director, who is responsible for reviewing the
23  EC's decision and "mak[ing] a recommendation to the Executive Committee as to
24  whether it should uphold or change its decision[.]" (AR 2330-31.) There are at least
25  five instances in the appeals provision stating that the Regional Director's
26  determination is a "recommendation." (*Id.*) Under the revised enrollment ordinance,
27  the EC's decision is deemed "final." (AR 2331.)
28  //

- 5 -                                                    13cv1435

### B.    Plaintiffs' Tribal Membership and Disenrollment

Plaintiffs are descendants of Margarita Britten, born in 1856 and identified on the Pala Band's November 1913 allotment roll as 4/4 degree Pala Indian blood.  (AR 2160.)  There had been "several inconsistent determinations" as to the blood degree of Ms. Britten's descendants, and up until July 1984, the BIA considered Ms. Britten as a "halfblood" in determining the blood degree of her descendants.  (AR 2165.)

On May 17, 1989, the Assistant Secretary issued a written decision regarding the appeal of one of Ms. Britten's descendants who had been declared as possessing 1/32 degree Pala blood.  (AR 2164.)  In order to resolve the descendant's appeal, the Assistant Secretary found it necessary to "first resolve the blood degree issue of Margarita Britten." (*Id.*)  In sustaining the descendant's appeal, the Assistant Secretary concluded that Ms. Britten was a "fullblood" and "direct[ed] that the blood degree of her descendants be reviewed and corrected accordingly."  (AR 2165.)  It is important to note that that decision was reached under the Articles of Association and original enrollment ordinance.

On February 3, 2012, the EC sent letters to Plaintiffs notifying them that they are no longer members of the Pala Band and that their rights to tribal benefits were terminated.  (AR 1385, 2089; *see also* AR 1285-86.)  The decision was based upon a review of enrollment information, and a vote at a "duly called Special Meeting of the Executive Committee of the Pala Band . . . with a quorum present." (*Id.*; *see also* AR 1285-86.)  Plaintiffs appealed the EC's decision to the Regional Director.  (AR 2076-87.)

On June 7, 2012, the Regional Director sent letters to Plaintiffs regarding their appeal.  (AR 1284-86.)  In those letters, it was noted that disenrollment decisions are based on Section 8 of the Pala Band's revised enrollment ordinance, and "[b]ecause the Band's Enrollment Ordinance does not invoke any provision of federal law that would provide the Bureau of Indian Affairs with the authority to decide enrollment appeals, there is no required federal action to take with regard to these requests, and [the

Regional Director] cannot render any decision regarding the Executive Committee's actions." (AR 1284.) Instead, Section 8 of the Enrollment Ordinance only "permit[ted] the Regional Director to provide informal recommendations on the Executive Committee's actions." (*Id.*)  The Regional Director recommended that Plaintiffs "remain enrolled with the Band as there was no evidence provided to support the disenrollment of these individuals," and that the Pala Band "continue to recognize the membership status of the individuals affected by the February 3, 2012[] Executive Committee action." (*Id.*)

Plaintiffs then appealed within the Department of the Interior, first to the Interior Board of Indian Appeals ("IBIA"), and then to the Assistant Secretary. (AR 1188-1273.)  The Assistant Secretary invited the parties to file motions to supplement the record, indicated that he would consider additional specified documents in addition to the administrative record, and allowed the parties to brief issues raised in the consolidated appeals. (AR 26-28.)

### C.    The Assistant Secretary's June 2013 Decision

On June 12, 2013, the Assistant Secretary issued his decision affirming the Regional Director's letters. (AR 1-23.)  Addressing the nature and extent of the Department's authority, the Assistant Secretary reasoned that the "statute of limitations . . . precludes a challenge to the approval to the Constitution's effectiveness and applicability[,]" and based on "prior practice," rejected arguments that an "election" was required to amend the Articles of Association or adopt a new Constitution. (AR 12-16.)  In reaching those conclusions, the Assistant Secretary noted that "as a general matter, it is not appropriate for the Department to intervene in internal tribal disputes or procedural matters[,]" and that "[i]t is also well established that the Department does not exercise jurisdiction over tribal disputes regarding the merits of a particular law passed by a tribe." (AR 13, 15.)  Furthermore, the Assistant Secretary concluded that the Pala Band "has not provided the Assistant Secretary a decision-making role under

the 2009 enrollment ordinance." (AR 16-18.)  The decision also addressed the other "remaining arguments" presented.  (AR 18-19.)

Ultimately, the Assistant Secretary decided "that the Regional Director acted based on a proper interpretation of authority under tribal law to review the enrollment appeals[,]" highlighting that "[t]ribal law limited the Regional Director to making a 'recommendation,' rather than actually deciding the enrollment appeals." (AR 23.)  It was further decided that "the Department has no authority under Federal or tribal law to decide enrollment issues for the Band." (*Id.*)

### D.   Procedural History of This Action

On June 19, 2013, Plaintiffs filed this complaint seeking review of the Assistant Secretary's June 2013 decision under the APA and the arbitrary-and-capricious standard.  (Compl. ¶ 38.)  They assert four separate claims for declaratory relief to set aside the AS-IA's decision: (1) that the 6-year APA statute of limitations applies; (2) to recognize the 1997 Constitution as "effectively" adopted as the Pala Band's governing document; (3) that the 2009 revised enrollment ordinance applies and that the BIA can only issue a "recommendation"; and (4) to not name individual minors Joseph Ravago and Kaley Ravago ("Ravago Minors") as joined parties in the AS-IA appeal.  On August 15, 2013, Defendants answered.

Now pending before the Court are the parties' cross-motions for summary judgment.  (ECF Nos. 54, 57.)  The unredacted administrative record was filed under seal.  (ECF No. 64.)  Following briefing, the parties appeared for oral argument on November 17, 2014.

## II.   STANDARD OF REVIEW

Summary judgment is proper if the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).  Summary judgment is a particularly appropriate tool for resolving claims challenging agency action. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).  As the administrative record constitutes the entire factual record in this case and there are no facts at issue between the parties, this matter is ripe for summary judgment.

A final agency action is reviewable under 5 U.S.C. § 706 when "there is no other adequate remedy in a court." 5 U.S.C. § 704.  Under the APA, a reviewing court shall "hold unlawful and set aside agency action[s], findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Review under this standard is "searching and careful," but also "narrow."  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989). "Although [the court's] inquiry must be thorough, the standard of review is highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and [the court] may not substitute [its] own judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).

An agency decision is arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfgs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Hovhannisyan v. U.S. Dep't of Homeland Sec.*, 624 F. Supp. 2d 1135, 1149 (C.D. Cal. 2008) ("[A]n agency abuses its discretion when it fails to comply with [its own] regulations.").  The agency must "cogently explain why it has exercised its discretion in a given manner," and the reviewing court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43.

Where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence." *Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d 1071, 1076 (9th Cir. 2003). Even "[i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings." *Id.* A court must also "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned . . . [but] may not infer an agency's reasoning from mere silence." *Arlington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). The burden is on the plaintiffs to show any decision or action was arbitrary and capricious. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

## III.   DISCUSSION

In this lawsuit, Plaintiffs challenge multiple aspects of the Assistant Secretary's June 2013 decision, including its ultimate conclusion, arguing that certain determinations and findings in the decision are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Defendants respond arguing that the Assistant Secretary acted reasonably in affirming the Regional Director's letters. The Court will address each issue raised by the parties below.

### A.   The Pala Band's 1997 Constitution[4]

The Assistant Secretary concluded that the 1997 Constitution is the Pala Band's governing document. (AR 12-16.) Plaintiffs challenge that conclusion on the four following grounds: (1) the finding that "elections" and "meetings" were

---

[4] Normally, "disputes involving questions of interpretation of the tribal constitution and tribal law is not within the jurisdiction of the district court." *Alto v. Black*, 738 F.3d 1111, 1123 n.9 (9th Cir. 2013) (quoting *Runs After v. United States*, 766 F.2d 347, 352 (8th Cir. 1985)) (internal quotation marks omitted). However, "[d]ecisions of the BIA made at the level of Assistant Secretary or above, are apparently reviewable in district court." *Id.* (quoting *Kaw Nation v. Norton*, 405 F.3d 1317, 1324 n.10 (Fed. Cir. 2005)) (internal quotation marks omitted); *see also Shenandoah v. U.S. Dep't of Interior*, 159 F.3d 708, 712 (2d Cir. 1998).

interchangeable based on past customs and traditions was made without a factual inquiry and is therefore an abuse of discretion; (2) the finding that the Pala Band effectively voted to adopt the 1997 Constitution is arbitrary, capricious, and an abuse of discretion in light of the Band's purported admission to a federal agency and on its public website that it operates under the Articles of Association; (3) it was an abuse of discretion to apply a definition of "elections" that runs counter to its plain meaning; and (4) the finding that there were two votes on the adoption of the 1997 Constitution is an abuse of discretion.  Plaintiffs' challenge distills down to whether the Assistant Secretary's conclusion that the 1997 Constitution governs is justified by his determination that the Pala Band complied with adoption and effectiveness requirements, and whether that determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Upon reviewing the administrative record, the Court finds that Plaintiffs fail to meet their burden of demonstrating that the Assistant Secretary's determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

## 1.    "Elections" and "Meetings"

Plaintiffs argue that the interchangeable use of "elections" and "meetings" is arbitrary and capricious because the Assistant Secretary "failed to make [a] reasonabl[e] [factual] inquiry and failed to fully consider an important aspect of the issue."  (Pls.' Mot. 16:17–28.)   Among other things, Plaintiffs contend that the Assistant Secretary failed to consider the declaration of former Pala Chairman King Freeman and ignored the declaration of Elsie Lucero.  This challenge appears to be solely directed at the circumstances related to the adoption of the 1997 Constitution pursuant to the Articles of Association.  (*See* Pls.' Mot. 16:7–17:22; *see also* AR 13 ("The arguments about the 1997 Constitution have two parts—whether it was adopted and whether it became effective, both procedural challenges that should have been

brought within 6 years of 2000.  The first issue is impacted by how the Articles of Association can be amended, the latter issue by the terms of the Constitution.").)

### a.    Past Customs

There is no dispute that the Articles of Association governed before November 1997, and that any amendment would need to comply with it.  Section 11 provides that "[t]hese Articles of Association may be amended by a majority vote of the General Council and such amendment shall be in effect upon the approval of the Commissioner of Indian Affairs."  (AR 2103.)  The General Council "consist[s] of all adult members eighteen (18) years of age or older[,]" and a meeting of the General Council is not valid "unless there shall be present at least 25 voters and no business shall be conducted in the absence of a quorum."  (AR 2098, 2101.)

The amendment provision does not specify whether the required majority vote must occur at a meeting or election.  The Articles of Association do contain a provision for elections though, which requires all elections, whether for officers or by way of a referendum, comply with ordinances adopted by the governing body.  (AR 2098-99.) The elections provision does not make any reference to the General Council.  (*Id.*)  The meetings provision, however, provides certain voting requirements for the General Council in order to "conduct business."  (AR 2101.)  Specifically, the Articles of Association state that "[a] meeting of the General Council shall not be valid unless there shall be present at least 25 voters and no business shall be conducted in the absence of a quorum," and "[a]ll General Council meetings to be recognized shall be publicly noticed for fourteen (14) days."  (*Id.*)

Applying the principle requiring the Department of the Interior to "avoid unnecessary interference with tribal self-government" in reviewing tribal constitutions and amendments, the Assistant Secretary deferred to the Pala Band's interpretation of

the voting requirement in the amendment provision.[5]  (AR 13-14 (citing *Cheyenne River Sioux Tribe v. Aberdeen Area Dir.*, 24 IBIA 55, 62 (1993).)  To determine the Pala Band's interpretation, the Assistant Secretary reviewed the adoption of and past amendments to the Articles of Association.  (*Id.*)

In August 1959, the Articles of Association were adopted at a "duly called general tribal meeting" by a vote of 21 in favor and none opposed.  (AR 2103.) Similarly, in March 1961, the General Council "ratified" Amendment No. 1 at another "duly called general meeting" by a vote of 27 in favor and none opposed.  (AR 2105.) The documents related to the adoption of Amendment No. 2, however, identify the June 7, 1973 vote as "referendum election" (AR 2108) and "duly called general meeting" (AR 2111), suggesting that the term election and meeting were used interchangeably, at least, at that time.  Lastly, Amendment No. 3 was adopted following a "duly called Referendum Election" by the General Council with a vote of 59 in favor and 26 opposed.  (AR 2114.)

The administrative record shows that there were instances when the Pala Band used meetings, elections, or both in the adoption of a constitution and its amendments. Consequently, the past customs of the Pala Band support the Assistant Secretary's determination that the terms "elections" and "meetings" were used interchangeably for the purposes of adopting or amending the Articles of Association.

### b.      Compliance with 14-day Notice Provision

Plaintiffs present another loosely related challenge to the validity of the 1997 Constitution, arguing that "the record establishes that the AS-IA abused his discretion in applying the Articles of Association theory because there was no evidence that the 14-day notice provision was complied with."  (Pls.' Reply 10:12–17.)  However, the

---

[5] The principle applied by the Assistant Secretary is also consistent with federal case law.  *See Wopsock v. Natchees*, 454 F.3d 1327, 1332-33 (Fed. Cir. 2006); *Wheeler v. U.S. Dep't of Interior, Bureau of Indian Affairs*, 811 F.2d 549, 553 (10th Cir. 1987).

Court is unable to locate another instance when this argument was raised before the Assistant Secretary. (AR 67-86.) In fact, it appears that the 14-day notice provision is not referenced a single time in Plaintiffs' appellate brief to the Assistant Secretary. (*See id.*)

It would be inappropriate to permit Plaintiffs to raise a new issue during the judicial-review process when this particular issue was not first presented to the Assistant Secretary. The parties never had the opportunity to investigate, produce, and present evidence addressing the issue while compiling the administrative record. These practical considerations aside, the Assistant Secretary did not make any determination regarding whether the 14-day notice provision was properly followed. In fact, the Assistant Secretary does not mention the 14-day notice provision a single time in his decision. As a result, there is no finding related to the compliance with the 14-day notice provision by the Assistant Secretary that is properly being challenged. Thus, though there is no evidence in the administrative record that the Pala Band complied with the 14-day notice requirement in the Articles of Association, this Court will not hold the Assistant Secretary responsible for not addressing an issue that Plaintiffs failed to present.

### c.      Freeman and Lucero Declarations

Plaintiffs also argue that the Assistant Secretary "ignored relevant probative evidence," specifically, the declarations of King Freeman and Elsie Lucero, in determining that the Pala Band's customs and practice show that the 1997 Constitution was properly adopted. (Pls.' Mot. 17:11–22.)

With respect to the Freeman Declaration, Plaintiffs "make[] no showing that the district court need[s] to go outside the administrative record to determine whether the [agency] ignored information." *See Animal Def. Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988); *see also Blue Ocean Inst. v. Guttierez*, 503 F. Supp. 2d 366, 369 (D.D.C. 2007) (An agency enjoys "a presumption that it properly designated the

administrative record," and this imposes on the moving party "the burden of going forward with evidence to meet or rebut that presumption."). Consequently, the Court is not required to consider it.

However, even if the Court considers the Freeman Declaration, it is merely one interpretation of the language for amending the Articles of Association to be weighed that is consistent with at least one interpretation that the Assistant Secretary already considered, *i.e.*, the procedures for Amendment No. 3 that used an election rather than a meeting to approve amendment. *See Rochling v. Dep't of Veterans Affairs*, No. 8:10CV302, 2011 WL 5523556, at *4 (D. Neb. Sept. 27, 2011) ("The information that the panel reviewed considered in making its decision is presumptively contained in the administrative record. Therefore, to the extent that Plaintiff, through his motion, wishes to demonstrate what was and was not considered, it is unnecessary.")

Plaintiffs also identify the Lucero Declaration for the proposition that the definition of "elections" differs from "meetings." (Pls.' Mot. 17:11–22; *see also* AR 92 ("My interpretation of the word 'election' . . . .").) Unlike the Freeman Declaration, the Lucero Declaration was included in the administrative record and presumed to have been considered. According to Plaintiffs, the Assistant Secretary "failed to reasonably explain why he rejected Elsie Lucero's declaration after Plaintiffs moved to supplement the evidence and cited in it in their brief." (Pls.' Mot. 17:11–22.) To the contrary, the Assistant Secretary implicitly rejects the declaration based on past amendment customs, which included adoptions through elections *and* meetings. The declaration does not provide a dispositive fact, but rather is merely further evidence supporting the proposition that the Pala Tribe at least also used elections to adopt some amendments to the Articles of Association. That determination in addition to the evidence showing that meetings were also used in the amendment process is consistent with the Lucero Declaration and the Assistant Secretary's conclusion. Therefore, Plaintiffs fail to meet their burden of demonstrating that the Assistant Secretary "failed to consider an important aspect the problem." *See State Farm*, 463 U.S. at 43.

Reviewing both declarations, the Court cannot conclude that Plaintiffs satisfy their burden of showing that the Assistant Secretary's path of reasoning cannot be reasonably discerned. *See Arlington*, 516 F.3d at 1112. There is ample evidence in the administrative record that shows at least one rational interpretation of the evidence supporting the Assistant Secretary's conclusion that adopting a new constitution under the Articles of Association may be done through an election or a meeting. *See Bear Lake Watch*, 324 F.3d at 1076.

### 2.     Plain Meaning of "Election"

"[T]he organic law of the [tribe] found in the Constitution authorized by statute, formulated and adopted by the tribal members and approved by the Secretary of the Interior should be construed for its ultimate meaning under the same rules as are applied in the construction of state and federal constitutions and statutes." *Hopi Indian Tribe v. Comm'r, Bureau of Indian Affairs*, 4 IBIA 134, 140-41 (1975). The first rule of constitutional interpretation is to look to the plain meaning of the text. *See Solorio v. United States*, 483 U.S. 435, 447 (1987); *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 188 (1824) (Marshall, C.J.) ("As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said."). "Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions[.]" *Costo v. United States*, 248 F.3d 863, 871 (9th Cir. 2001). Judges may also be required to "determine, through history or analogy, the most appropriate legal rule in a particular situation." *Id.* Nonetheless, "deference should be given to tribal courts in regard to their interpretation of tribal constitutions." *Tom v. Sutton*, 533 F.2d 1101, 1106 (9th Cir. 1976).

//

Plaintiffs argue that the plain meaning of "election" should have been applied by the Assistant Secretary under the Articles of Association. (Pls.' Mot. 19–25.) To support their argument, Plaintiffs direct the Court's attention to the "clearly defined sections with definitions for 'Elections' and 'Meetings.'" (*Id.*) But Plaintiffs mistakenly focus on the plain meaning of these particular words out of their proper context. The provision being interpreted that requires a plain reading is the Article of Association's amendment provision, which states that it "may be amended by a majority vote of the General Council and such amendment shall be in effect upon the approval of the Commissioner of Indian Affairs." (AR 2103.) The operative language that requires interpretation is "majority vote of the General Council," and whether that majority vote must occur during an election or may occur during a General Council meeting.

Looking to the plain language of the amendment provision, and given that the provision does not specify the need for an election or meeting, it appears that a majority vote of any kind by the General Council is sufficient to amend the Articles of Association regardless of whether the vote occurs in an election or meeting. At best, whether an election or a meeting is required is ambiguous from the plain language of the amendment provision. When the language is ambiguous, it is appropriate for the court to take into account other considerations, such as history. *See Costo*, 248 F.3d at 871.

The history of past amendments to the Articles of Association—including the information provided in the Lucero and Freeman Declarations—suggests that both elections and meetings were acceptable voting procedures for adopting constitutions and amendments. The Assistant Secretary explicitly identified that the "provision does not specify whether the vote occur at a meeting or at an election" (AR 15), then looked to the history of the amendment process and reached a reasonable construction of the ambiguous provision—both elections *and* meetings were used and thus are acceptable voting procedures for amending the Articles of Association. *See Costo*, 248 F.3d at

871.  The Assistant Secretary's conclusion is consistent with and supported by the Pala Band's own apparent interpretation of the amendment language provided through their historical use of both elections and meetings.  *See Tom*, 533 F.2d at 1106.

As a lingering matter, Plaintiffs passingly mention that the plain language of the 1997 Constitution supports their position regarding the plain meaning of "elections." The 1997 Constitution is relevant primarily for the purpose of determining when it became effective following proper adoption; the adoption process is determined by the Articles of Association.  Plaintiffs do not address that distinction.  However, even if the Court looks to the language of the 1997 Constitution, the conclusion is the same that the Assistant Secretary's conclusion is supported by the administrative record.  *See* 5 U.S.C. § 706(2)(A).

### 3.    The Pala Band's "Admissions"

The administrative record "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's positions."  *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (emphasis in original).  "Agencies are not required to consider every alternative proposed nor respond to every comment made.  Rather, an agency must consider only 'significant and viable' and 'obvious' alternatives."  *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1165 (10th Cir. 2014) (quoting *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013)) (internal quotation marks omitted).  A court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[.]"  *Arlington*, 516 F.3d at 1112.

Plaintiffs argue that the Assistant Secretary's decision is arbitrary, capricious, and an abuse of discretion because he "failed to state why he was rejecting evidence" of the Pala Band's gaming ordinance and website in which the Articles of Association are identified as the Band's governing documents. (Pls.' Mot. 18:1–19:2.) The Band's gaming ordinance passed on October 20, 1999, and was submitted to the National

Indian Gaming Commission.  Defendants explain that Plaintiffs' argument lacks merit because the gaming ordinance was passed before the 1997 Constitution became effective in 2000, and the website has no authority to amend the Band's actions. (Defs.' Mot. 20 n.4.)

Plaintiffs fail to provide any legal authority requiring the Assistant Secretary to specifically identify *every* issue or *every* fact raised by the parties.  To the contrary, courts "must defer to a reasonable agency action 'even if the administrative record contains evidence for and against its decision.'" *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quoting *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009)).  At worst, the lack of a specific explanation addressing the "admissions" is a decision that is "less than ideal clarity." *See Arlington*, 516 F.3d at 1112.  But that alone is not adequate to find that the Assistant Secretary acted arbitrarily, capriciously, or abused his discretion. *See id.*

Furthermore, Defendants raise very astute points raising doubts about the relevance of these "admissions," including the timing of the purported admission through the gaming ordinance and website as well as their operative effect. (*See* Defs.' Mot. 20 n.4.)  Even though there may be more than one rational interpretation of the administrative record, the Assistant Secretary's path to his conclusion can be reasonably discerned. *See Arlington*, 516 F.3d at 1112.  Therefore, Plaintiffs fail to demonstrate that the Assistant Secretary's conclusion was arbitrary, capricious, or an abuse of discretion on this ground. *See id.*

### 4.    Two General Council Votes Adopting the 1997 Constitution

Plaintiffs argue that the Assistant Secretary "abused his discretion in concluding the Pala Band's 1997 Constitution submitted by the EC was adopted by two General Council meeting votes[,]" and the conclusion was reached "without making a reasonable inquiry." (Pls.' Mot. 20:3–26.)  As a related issue, they also argue that "the BIA violated its trust responsibility because the AS-IA failed to make inquiry and

consider that the 27 member vote was <u>not</u> a majority of tribal members in 1997." (*Id.* at 20:26–21:10 (emphasis in original).) Upon reviewing the administrative record, the Assistant Secretary's conclusions do not run contrary to the evidence.

The Assistant Secretary found that the 1997 Constitution was adopted in November 1997 based on a certification that provides that the adoption resolution was voted on "at a duly called meeting of the Band," and passed with a quorum present by a vote of 27 in favor and none opposed. (AR 14.) *Alternatively*, the Assistant Secretary also concluded that "even if an election was required to adopt the Constitution, an election occurred in 1994." (*Id.*) That alternative conclusion is based on Resolution 97-36, which recognized the adoption of the 1997 Constitution as superseding the Articles of Association. (AR 14, 359.) The relevant excerpt from Resolution 97-36 states that "on November 22, 1994, the Pala General Council in the General Election of the Tribe voted to revise the Pala Tribal Articles of Association into the Pala Tribal Constitution." (AR 359.) Interestingly, King Freeman was one of the signatories of Resolution 97-36. (*Id.*)

Moreover, Plaintiffs' characterization of the Assistant Secretary's conclusions is inaccurate. They contend that they are challenging the finding as to "two General Council meeting votes," but that is not what the Assistant Secretary concluded. He concluded that the November 1997 meeting adequately adopted the Constitution, and alternatively, if an election was required, one occurred in November 1994. The administrative record may be susceptible to more than one rational interpretation regarding the interchangeable use of "elections" and "meetings," but the evidence suggesting that an election occurred in November 1994 adopting the Constitution is apparent. The same is true for the November 1997 meeting. There is evidence that rationally and reasonably connects the evidence in the administrative record to both of the Assistant Secretary's *alternative* findings. *See Arlington*, 516 F.3d at 1112.

//

//

Relying heavily on *California Valley Miwok Tribe v. United States*, 515 F.3d 1262 (D.C. Cir. 2008), Plaintiffs also argue that the Assistant Secretary violated his trust responsibility to Indian tribes by "'retroactively' approv[ing] a completely new governing document with substantial changes from the Articles of Association." (Pls.' Reply 12:1–13:3; *see also* Pls.' Mot. 21:11–23:17.)  They suggest that constitutional reform should have "fully and fairly involve[d] the tribal members in the proceedings leading to constitutional reform." (Pls.' Reply 12:1–19 (internal quotation marks omitted).)  There is doubt whether such general trust obligations apply in this circumstance because a rights-creating or duty-imposing statute or regulation has not been identified. *See United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) (linking the general trust relationship to "specific rights-creating or duty-imposing statutory or regulatory prescriptions").  But even assuming that the Assistant Secretary was bound by the general trust obligation, the administrative record shows that the Assistant Secretary fulfilled his duties by considering the evidence in the administrative record and issuing a thorough decision explaining his conclusion regarding November 1994 election and November 1997 meeting adopting the 1997 Constitution.  The administrative record, as discussed in greater detail above, supports the Assistant Secretary's conclusion.  Therefore, the Court rejects Plaintiffs' contention that the Assistant Secretary's decision failed to fulfill his general trust obligation.

**B.     Six-Year Statute of Limitations to Challenge Approval of the 1997 Constitution**

"APA claims are subject to a six-year statute of limitations." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2013) (citing 28 U.S.C. § 2401(a); *Wind River Mining Corp. v. United States*, 946 F.2d 710, 712-13 (9th Cir. 1991)).  "To bring a claim under 5 U.S.C. § 706(2), plaintiffs must identify a final agency action upon which the claim is based." *Id.* (citing 5 U.S.C. § 704).  To be "final" an agency action "must mark the consummation of the agency's decisionmaking

process—it must not be of a merely tentative or interlocutory nature." *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citation omitted). It must also be an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178.

"Under federal law a cause of action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action." *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1396 (9th Cir. 1986). However, "[i]f a person wishes to challenge a mere procedural violation in the adoption of a regulation or other agency action, the challenge must be brought within six years *of the decision*." *Wind River*, 906 F.2d at 715 (emphasis added). "Under well-settled circuit authority, a cause of action challenging procedural errors in the promulgation of regulations [or other agency actions] accrues on the issuance of the rule." *Cedars-Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1129 (9th Cir. 1999) (citing *Wind River*, 906 F.2d at 1364-66; *Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1364-66 (9th Cir. 1990); *Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir. 1988). "Actual knowledge of the government action . . . is not required for a statutory period to commence." *Shiny Rock*, 906 F.2d at 1364.

The crux of Plaintiffs' argument is that "the challenged action accrued upon Regional's action acknowledging the void ordinance and void constitution when Regional applied the 2009 revised enrollment ordinance against the plaintiffs' interest on June 7, 2012 causing plaintiffs to suffer an injury in fact." (Pls.' Reply 7:27–8:3 (footnote omitted).) However, it is uncontested that the challenge made before the Assistant Secretary raised a procedural violation regarding the adoption of the 1997 Constitution and its subsequent approval by the Regional Director. (AR 12.) That fact has a substantial impact on the determination of when Plaintiffs' cause of action began accruing.

Challenges to procedural violations by agencies do not apply the traditional rules regarding federal statutes of limitations. *See Wind River*, 946 F.2d at 716. Rather than

accruing when the plaintiff is aware of the wrong or when the injury occurs, "[t]he right to bring a civil suit challenging an agency action accrues 'upon the completion of the administrative proceedings.'" *See id.* (quoting *Crown Coat Front Co. v. United States*, 386 U.S. 503, 511 (1967).) That tenet is consistent with case law throughout the Ninth Circuit. For example, in *Shiny Rock*, the Ninth Circuit held that a challenge to mining regulations accrued when the regulations were promulgated and not when the plaintiffs' mining application was denied many years later. *See Shiny Rock*, 906 F.2d at 1364-66. Similarly, in *Shalala*, the Ninth Circuit determined that the APA claim accrued at the time of the procedural announcement and not when the hospital plaintiffs sustained injuries as a result of a federal agency's denial of their claims for payment. *See Shalala*, 177 F.3d at 1129.

Plaintiffs urge the Court to find that the challenge to the validity the 1997 Constitution accrued at the time when they became aware of the alleged wrong or when they were actually injured, but that finding would be inconsistent with Ninth Circuit precedent. *See Shalala*, 177 F.3d at 1129; *Wind River*, 906 F.2d at 1364-66; *Shiny Rock*, 906 F.2d at 1364-66. The administrative record supports the Assistant Secretary's uncontested determination that the challenge to the adoption of the 1997 Constitution and its subsequent approval by the Regional Director is procedural. (AR 12.) The Assistant Secretary also relied on the appropriate legal authority in reaching his conclusion that Plaintiffs' challenge to the adoption of the 1997 Constitution "is now time-barred as the statute of limitations started to run in 2000." (*Id.*) Given that the Regional Director approved the Constitution in July 2000 (AR 2139-41), the Court cannot conclude that the Assistant Secretary's conclusion regarding the statute of limitations is arbitrary, capricious, or otherwise not in accordance with law.[6]

---

[6] Without great detail, Plaintiffs contend that the statute-of-limitations issue was already decided in a prior case, *Aguayo v. Salazar*, No. 12-cv-551-WQH(KSC). (Pls.' Mot. 14:14–25; Pls.' Reply 6:26–7:11.) However, Plaintiffs' characterization of the relevant order is inaccurate. The Court mentioned the statute of limitations in passing while concluding that it lacked subject matter jurisdiction over a particular claim. There was no final decision regarding the statute of limitations.

## C.   The Pala Band's Enrollment Ordinance No. 1

According to Plaintiffs, the Assistant Secretary "abused his discretion by concluding the Pala Band's 2009 revised enrollment ordinance only authorizes the BIA to make 'recommendations' and failing to accept the plain meaning of the WHEREAS clause." (Pls.' Mot. 32:18–24:10.)  They go on to explain that the language of the ordinance suggests that it should not "apply retroactively to Plaintiffs who were already enrolled members . . . on the date of adoption." (*Id.*; *see also* Pls.' Reply 2:16–3:3.)

The prefatory statement that Plaintiffs refer to states that:

> the Executive Committee of the Pala Band, by adoption of this revised Ordinance, does not intend to alter or change the membership status of individuals whose membership has already been approved and who are currently listed on the membership roll of the Pala Band of Mission Indians, nor does it intend to change the membership status of those persons whose membership applications have previously been disapproved[.]

(AR 2325.)  The Assistant Secretary's decision also refers to a highly relevant provision in the ordinance—Section 6—which authorizes the "Reevaluation of Approved [Membership] Applications" should the EC "subsequently find that an applicant or the person filing the application on his/her behalf misrepresented or omitted facts that might have made him/her ineligible for enrollment, his/her application shall be reevaluated in accordance with the procedure for processing an original application." (AR 2329-30.)

Plaintiffs' emphasis on the operative effect of the prefatory language is misplaced. "[W]here the text of a clause itself indicates that it does not have operative effect, such as 'whereas' clauses in federal legislation or the Constitution's preamble, a court has no license to make it do what it not designed to do." *Dist. of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008); *see also Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009); *Yazoo & Mississippi Valley R. Co. v. Thomas*, 132 U.S. 174,

---

Consequently, the issues discussed in the order identified are not relevant to the issues here.

188 (1889) ("[A]s the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous, the necessity of resorting to it to assist in ascertaining the true intent and meaning of the legislature is in itself fatal to the claim set up.").

In *Office of Hawaiian Affairs*, the United States Supreme Court faced the question of "whether Congress stripped the State of Hawaii of its authority to alienate its sovereign territory by passing a joint resolution to apologize for the role that the United States played in overthrowing the Hawaiian monarchy in the late 19th century." 556 U.S. at 166.  The Hawaii Supreme Court's holding was "[b]ased on a plain reading of" the "whereas" clauses, that "Congress has clearly recognized that the native Hawaiian people have unrelinquished claims over the ceded lands." *Id.* at 175 (quoting *Office of Hawaiian Affairs v. Housing & Cmty. Dev. Corp. of Hawaii (HCDCH)*, 117 Hawai'i 174, 191 (2008)) (internal quotation marks omitted).  However, in reversing the lower court's decision, the United States Supreme Court criticized the Hawaii Supreme Court's "attention to 37 'whereas' clauses that preface the Apology Resolution[,]" rather than "focusing on the operative words of the law." *Id.* at 175 (citing *Heller*, 554 U.S. at 578 n.3).

The principle that applied to *Heller* and *Office of Hawaiian Affairs* also applies here—the operative language in the body of the ordinance itself trumps non-operative language in the preface or preamble.  *See Office of Hawaiian Affairs*, 556 U.S. at 175; *Heller*, 554 U.S. at 578 n.3.  Though the prefatory statement to the revised Ordinance No. 1 expresses an intent to not "alter or change the membership status of individuals whose membership has already been approved[,]" the operative language of the ordinance itself in Section 6 unequivocally confers the authority to the EC to reevaluate approved membership applications under certain circumstances.  (AR 2325, 2329-30.) As a result, the Court cannot conclude that the Assistant Secretary's conclusion that "[t]he express language in the operative provision of the ordinance controls over the introductory 'resolved' clause" is an abuse of discretion.

Even if the prefatory language had an operative legal effect, which it does not, it is ambiguous at best whether that language excludes the possibility of reevaluating approved membership applications. According to Black's Law Dictionary, "intend" is defined as a verb "[t]o have in mind a fixed purpose to reach a desired objective; to have as one's purpose." "[D]oes not intend" does not provide a clear and mandatory exclusion of certain actions that, for example, "shall not" would. The drafters of the revised enrollment ordinance used mandatory language, such as "shall" and "shall not," throughout the ordinance, requiring and prohibiting various actions. (*See e.g.*, AR 2326, 2329, 2331.) "The use of the word 'shall' in the statute, although not entirely controlling, is of significant importance, and, indicates an intention that the statute should be construed as mandatory." *United States v. Chavez*, 627 F.2d 953, 955 (9th Cir. 1980) ("The grammatical structure of the statute and the use of the word 'shall' compel the conclusion that the provision is mandatory.").

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). This principle also applies to Indian law. *See Hopi Indian Tribe*, 4 IBIA at 140. Applying that principle, it is apparent that had the drafters of the revised enrollment ordinance wished to prohibit the EC's authority to alter or change the status of approved members, they would have expressly done so. The drafters also would have omitted portions of Section 6 or perhaps the entire provision, removing the express authority conferred to the EC to reevaluate any approved membership applications.

The operative text of the revised enrollment ordinance is unambiguous. It provides the EC with the final authority to reevaluate approved member applications, and designates the Regional Director's role in eligibility appeals as advisory. (AR 2325, 2330-31.) Therefore, the Court cannot conclude that the Assistant Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance of law.[7]  *See* 5 U.S.C. § 706(2).

### D.  Effect of Collateral Estoppel on Assistant Secretary's 1989 Decision Regarding Ms. Britten's Blood Degree

Plaintiffs argue that the Assistant Secretary was bound by the 1989 decision finding Ms. Britten as full-blooded Indian status under the doctrine of collateral estoppel and "the BIA's management responsibility [under 25 U.S.C. § 2] requir[ing] the BIA to honor and enforce the agency's 1989 final decision." (Pls.' Mot. 9:20–13:9; *see also* Pls.' Reply 2:7–6:21.)  The parties brief this issue quite extensively, but the question is much narrower than framed.  The question before this Court is whether the Assistant Secretary's determination that the "application of *res judicata* and collateral estoppel to the Regional Director is moot" is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2)(A).  It is not.

"The doctrine of issue preclusion [or collateral estoppel] prevents relitigation of issues actually litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding."  *Shaw v. Hahn*, 56 F.3d 1128, 1131 (9th Cir. 1995).  It is applied where "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding."  *Hydranautics v. FilmTec Corp.*, 2014 F.3d 880, 885 (9th Cir. 2000).  "The party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the

---

[7] Plaintiffs also argue that the Assistant Secretary's decision "fails to explain why he rejected Elsie Lucero's statement that the enrollment ordinance cannot be interpreted by the BIA against federally enrolled tribal members who were enrolled on July 22, 2009 because it was agency protocol for the agency's final decision in 1989 to be recognized as final." (Pls.' Mot. 24:4–10.)  The Court addresses and rejects a similar "fails to explain" argument above, and rejects this argument for the same reasons.

prior judgment." *Id.*

To begin, it is not entirely apparent to this Court that discussing collateral estoppel is relevant.  There is no determination by the Assistant Secretary that the recognition of Ms. Britten's blood degree is being changed in any way.  Plaintiffs fail to direct this Court's attention to anything in the administrative record changing the status of Ms. Britten's blood degree.  The letters informing Plaintiffs of the disenrollment do not reference Ms. Britten or her blood degree, but rather cryptically explain that the decision was "voted upon at a duly called Special Meeting of the Executive Committee . . . with a quorum present." (AR 1385, 2089.) There simply are no findings by the Assistant Secretary or any indication in the administrative record that the issue of Ms. Britten's blood degree is being relitigated in this action.  Ms. Britten's blood degree is not issue, Plaintiffs' membership status is.  Though it certainly is possible that the treatment of Ms. Britten's  blood degree was relevant to the EC's decision, it is unclear from the administrative record that that indeed was a consideration.  Making that assumption would rather require the Court to speculate as to the EC's justification to disenroll Plaintiffs.  Therefore, the collateral-estoppel analysis is not relevant, and the Assistant Secretary's determination that the "application of *res judicata* and collateral estoppel to the Regional Director is moot" is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2)(A).

Even if the Court assumes, for the sake of argument, that collateral estoppel warrants further discussion, the application of the doctrine is subject to an exception.  The "change in controlling law" exception to collateral estoppel applies where a controlling legal authority has rendered the first decision "obsolete or erroneous, at least for future purposes." *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 599 (1948); *see also Desire v. Gonzalez*, 245 F. App'x 627, 628 (9th Cir. 2007).  In *Desire*, the classification of the defendant's crime was "predicated on then-existing law that unequivocally established [the defendant's] crime as an aggravated felony."  245 F.

App'x at 628.  Since that time, the controlling law had changed.  *Id.*  As a result of that change, the Ninth Circuit found that the defendant was not barred by the doctrine of *res judicata*.  *Id.* (citing *Nunes v. Ashcroft*, 375 F.3d 805, 807 (9th Cir. 2004) for the proposition that "*res judicata* [is] inapplicable if [a] party can 'identify a change in controlling law.'")

The Assistant Secretary noted that Ms. Britten's blood degree was issued "under the procedures in the Band's 1960s-era ordinance."  (AR 18.)  The 1960s-era enrollment ordinance referenced is the original Ordinance No. 1 under the Articles of Association. (AR 2116-19.)  That ordinance granted final authority to the Secretary of the Interior in enrollment matters.  (AR 2118.)  But the authority granted by the enrollment ordinance changed following the adoption of the 1997 Constitution and the ordinance's subsequent revision.  For enrollment matters after the adoption of the 1997 Constitution and revised enrollment ordinance, the EC's decision was now "final," and the Regional Director's authority was relegated to providing recommendations.  (AR 2330-31.)   Though the clarity of the reasoning is less than ideal, the Assistant Secretary's path to concluding that determining the application of *res judicata* and collateral estoppel is moot may be reasonably discerned by applying the change-in-controlling-law exception.  *See Arlington*, 516 F.3d at 1112.

In identifying that the 1989 decision was issued under the 1960s-era ordinance, the Assistant Secretary's conclusion follows from the fact that there was a change in the controlling law.  The authority granted by the 1960s-era enrollment ordinance was superseded with the adoption of the 1997 Constitution and revised enrollment ordinance rendering the earlier governing documents obsolete.  And if there was any error by the Assistant Secretary in not recognizing the effect of the change in controlling law to the doctrines of *res judicata* and collateral estoppel, it is harmless because the end result is not affected; it remains that the collateral-estoppel doctrine does not apply.  *See PDK Labs. Inc. v. U.S. Dep't of Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome,

if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.); *see also Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993) ("The harmless error rule applies to judicial review of administrative proceedings, and errors in such administrative proceedings will not require reversal unless Plaintiffs can show they were prejudiced.").

Accordingly, the Court cannot conclude that the Assistant Secretary's decision to not apply and find moot the doctrine of collateral estoppel is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). Rather, it was just the opposite.

### E.    Ravago Minors' Status as Parties

Plaintiffs argue that the Assistant Secretary's decision rejecting the request to include the Ravago Minors as appellants is arbitrary. They present three grounds to support their argument: (1) the Ravago Minors' mother, Patricia Walsh, is a plaintiff in this action; (2) the minors' appeal is based on the same issues, "except the EC took formal action against them approximately 1 year later"; and (3) "neither the Band nor Regional specifically lodged an <u>objection</u> to the AS-IA joining the Ravago minors[.]" (Pls.' Mot. 24:11–26 (emphasis in original); *see also* Pls.' Reply 14:13–20.)

The Assistant Secretary's conclusion rejecting joinder states:

> The May 2013 brief filed by the Aguayo appellants moves to include 2 additional minors as appellants. There is no evidence submitted that these 2 minors appealed to the Regional Director. They were not listed in the Regional Director's letters of either June 7, 2012 or February 24, 2012. Since the Assistant Secretary is addressing appeals from the Regional Director's letters, and these 2 individuals did not demonstrate that they were before the Regional Director, they are not within the scope of the issues pending before the Assistant Secretary and are not added as named parties here.

(AR 20-21.)

//

//

Upon reviewing the administrative record, it is apparent that the Assistant Secretary's determination that "[t]here is no evidence submitted that these 2 minors appealed to the Regional Director" is accurate.  The only documents that reference the Ravago Minors in the administrative record are: (1) Plaintiffs' appellate brief to the Assistant Secretary (AR 68); (2) a letter to the Assistant Secretary dated April 19, 2013 requesting, among other things, that the Assistant Secretary "take jurisdiction" over the minors' appeal (AR 2613-14); and (3) the Assistant Secretary's June 2013 decision (AR 20-21).

Examining Plaintiffs' appellate brief more closely, the only evidence that they reference that is related to the Ravago minors is a "copy of the Ravago Notice of Appeal," identified as "Exhibit A."[8]  (AR 68.)  However, the document referenced is merely a photocopy of three shipping receipts; the contents of the package shipped—which may have been the minors' appeal—was not included in the administrative record.  (*See* AR 88.)  Similarly, the April 2013 letter to the Assistant Secretary does not show that the minors actually appealed any adverse decision to the Regional Director.  From these documents, it is not apparent that the minors actually appealed their disenrollment to the Regional Director.  As a result, Plaintiffs failed to demonstrate to the Assistant Secretary that the Ravago Minors properly exhausted their administrative remedies before pursuing an appeal to the Assistant Secretary.  *See Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846 (9th Cir. 2013) ("The exhaustion doctrine serves 'to permit administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process[,]'" and "[t]he APA requires that plaintiffs exhaust available administrative remedies before bringing grievances to federal court[.]").

//

//

___

[8] "Exhibit A" to the appellate brief is included in the administrative record at AR 88.

Given that the administrative record does not show that the Ravago Minors properly pursued their administrative remedies before seeking to join Plaintiffs' action, the Court cannot conclude that the Assistant Secretary acted arbitrarily in rejecting the minors' request for joinder. The Assistant Secretary made the appropriate assessment of the evidence presented in the administrative record and reasonably concluded that the minors were outside the scope of the issues pending before him. *See State Farm*, 463 U.S. at 43.

## IV.   CONCLUSION & ORDER[9]

The Court sympathizes with the hardships that Plaintiffs face as a result of their disenrollment from the Pala Band. The significance of terminating membership from one's tribe is not lost. However, the Court's role in this situation is "not to substitute its judgment for that of the agency," but rather to examine whether there is a "rational connection between the facts found and the choice made" by the agency. *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted). Under the standard prescribed by 5 U.S.C. § 706(2)(A), which is highly deferential to the agency, Plaintiffs fail to meet their burden to demonstrate that the Assistant Secretary's decision is in any way "arbitrary, capricious, an abuse or discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota*, 747 F.3d at 601.

In light of the foregoing, the Court **DENIES** Plaintiffs' motion for summary judgment, and **GRANTS** Defendants' cross-motion for summary judgment. Accordingly, this Court affirms the Assistant Secretary's June 2013 decision concluding that "the Regional Director acted based on a proper interpretation of

---

[9] After briefing had completed and after obtaining leave of the Court, Plaintiffs submitted a surrebuttal letter and Defendants filed a response. (ECF Nos. 61, 62, 65.) The Court considered the issues raised in these briefs, but finds that there are no issues raised that materially affect the Court's analysis in reaching its conclusion.

authority under tribal law to review the enrollment appeals[,]" and that "the Department has no authority under Federal or tribal law to decide enrollment issues for the Band." (*See* AR 23.)

**IT IS SO ORDERED.**

**DATED: November 18, 2014**

Hon. Cynthia Bashant
United States District Judge